FILED
2014 Jan-22  PM 02:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| ANDREA MARBURY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:11-cv-03251-JEO |
| | ) | |
| TALLADEGA COLLEGE, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Andrea Marbury ("Marbury") brings this action claiming that she was improperly terminated for engaging in protected conduct under the False Claims Act ("FCA"), 31 U.S.C. § 3730(h)(1).  Defendant Talladega College ("Talladega College") has moved for summary judgment on her claim.  (Doc. 12).  Upon consideration, the undersigned finds that summary judgment is due to be denied.

## I.  SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56 of the FEDERAL RULES OF CIVIL PROCEDURE, party is authorized to move for summary judgment on all or part of a claim or defense asserted either by or against the movant.  Under that rule, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. PROC. 56(a), Fed. R. Civ.  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  Once the

moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. PROC. 56(c)(1)(A) & (B).  Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  In its review of the evidence, a court must credit the evidence of the non-movant and draw all justifiable inferences in the non-movant's favor.  *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000).  At summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## II.    FACTS[1]

Talladega College is a private liberal arts college located in Talladega County, Alabama. (Hawkins Declaration at ¶ 2).[2]  It is the oldest fully accredited historically black private college in

---

[1] The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiff.  They are the "'facts' for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)."  *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[2] Dr. Billy Hawkins' declaration is located at document 14-1 (Exhibit 1) of "Defendant's Evidentiary Submission in Support of Motion for Summary Judgment."

Alabama.  (*Id*.)  Dr. Billy Hawkins ("Hawkins") is the President of Talladgea College.  Dr. Evelyn White ("White") is the Provost and Vice President of Academic Affairs.  (White Dep. at 9).[3]  Nicola Lawler ("Lawler") is the Title III Coordinator.  (Lawler Dep. at 7).[4]  Brenda Rhoden ("Rhoden") is the Human Resources Manager.[5]  (Rhoden Dep. at 6).

Title III of the Higher Education Act of 1965, as amended by the Higher Education Act of 1986, provides financial assistance to historically black colleges and universities to establish or strengthen their physical plants, financial management, academic resources, and endowment-building capacity.  Talladega College is a recipient of such funds.  (*Id*. at ¶ 3).

During the relevant period, Talladega College had ten programs operating with Title III grants.  Title III programs are sometimes referred to as activities, and the director of each program is sometimes referred to as the activity director.  (Lawler Dep. at 16).  One of those programs was Faculty Development where Marbury worked.  (*Id*. at 8-9).

Marbury began her employment at Talladega College as the Director of Faculty Development.[6]  (Marbury Dep. at 33).  The position was funded by a Title III grant specifically intended for faculty development.  (Lawler Dep. at 17).  Her contract ran from December 1, 2010, until the end of the fiscal year on June 30, 2011.  (Marbury Dep. at Ex. 3).  Marbury was an at-will employee, but it was understood by White and Marbury that her employment contract would be renewed if she continued to satisfactorily complete her duties and responsibilities.

---

[3]Dr. Evelyn White's deposition is located at document 14-2 (Exhibit 2).

[4]Nicola Lawler's deposition is located at document 14-3 (Exhibit 3).

[5]Brenda Rhoden's deposition is located at document 14-4 (Exhibit 4).

[6]This position is also referred to in the record as Faculty Development Coordinator.

3

(White Dep. at 47). She was responsible for assisting in faculty improvement, including training, continuing education, and research and publishing opportunities. (Marbury Dep. at 38-29; White Dep. at Ex. 3). She reported to Dr. White. (Marbury Dep. at 40).

When a faculty development activity required funding, Marbury would seek approval of the activity from Dr. White and approval for the expenditure of Title III funds from Lawler as the Title III Coordinator. (White Dep. at 25, 135; Lawler Dep. at 21; Marbury Dep. at 49). Marbury did not have authority to approve the expenditure of such funds on her own. (*Id*.) The proper procedure for expenditure of these funds required that Marbury submit a requisition for approval to Lawler. (Lawler Dep. at 22). However, on at least one occasion, Marbury approved the expenditure of Title III funds without Lawler's initial approval at the request of White. (Marbury Dep. at 48, 92).

White had no problems with Marbury other than counseling her regarding her demeanor.[7] (White Dep. at 26-28). By way of example, White notes that during her first faculty meeting on her first day, Marbury "stood up and gave directives to the faculty that they really did not appreciate." (*Id*. at 26). Marbury disputes White's recollection of the meeting, stating that she "never told faculty members what to do." (Marbury Dec. at ¶ 2). In a second example, White states that Marbury exceeded her role during faculty handbook revision meetings when Marbury expressed her opinion after she had been instructed to simply take notes for the meeting. (White Dep. at 28). After the meeting, Marbury sent a memo with directions to the deans that attended the meeting. (*Id*.) White states that this also exceeded Marbury's authority. Marbury counters

---

[7]Marbury did not have any disciplinary actions against her and she was evaluated as "outstanding" less than two months prior to her termination. (White Dep. at 73, 120, Ex. 6).

that after the meeting, White asked her to type up the notes and email them to the committee members and set a date for the next meeting. (Marbury Dec. at ¶ 2). After she did this, the members could not agree on a date for the next meeting so Marbury went back to White to ask if the meeting could proceed without all the members. Marbury never set the meeting date. (*Id.*)

In April or early May 2011, Talladega College was scheduled to begin a continuing education unit. Supervision for the program was under White as the Vice President of Academic Affairs. The program was to have a community site on the square in downtown Talladega. (White Dep. at 34-35). In advance of the opening of the site, White asked Marbury to obtain a poster to be used at the opening. (Marbury Dep. at 70; Marbury Dec. at ¶ 3). Marbury asked White who was going to pay the $90.00 for the poster. White responded, "I asked you for the forms to pay for the board." (*Id.*) To which, Marbury stated, "I can't get it for you because it's advertising. It's an unallowable expense. I can't do it." (*Id.*) Because White wanted it right away, Marbury paid for it herself and then sought reimbursement out of Title III funds from Lawler. (Marbury Dec. at ¶ 3). Lawler told Marbury that Title III funds could not be used for advertising and that they could not be used in the Continuing Education Program for any purpose. (*Id.*) Marbury then went back to White to be reimbursed out of the College's general funds. According to Marbury, when she (Marbury) told White what Lawler said, White asked why Lawler was being so picky. (Marbury Dep. at 95-96). White also told her to change the requisition description from advertising to "supplies or something else." (*Id.*) Ultimately, Marbury was reimbursed approximately four months later in July with money from the College's general fund. (Marbury Dep. at 83).

At some unidentified point, White and other faculty members were planning to go to New

5

York City for training.  White went to Marbury and asked her to pay for the trip.  Marbury said

that would be fine since she had some travel funds available.  (Marbury Dep. at 108-09).

Marbury then went to talk with Lawler about it.  Lawler told Marbury that she had already told

White that she could not use Faculty Development funds for travel.[8]  (*Id*. at 109).  In the end,

Title III funds were not used for the trip.

At another unspecified point, White approved summer work for Marbury, including that

she would plan a summer camp, approve faculty grants, publish the faculty newsletter, set up

faculty learning communities, purchase classroom technology, and start a technology pilot

program for the education department.  (Marbury Dec. at ¶ 4).  White also directed Marbury to

do research on the College's library to find out what was being done to fulfill accreditation

requirements.  (*Id*.)  Marbury also continued performing her other duties such as arranging travel,

preparing reports, and meeting Title III grant requirements.  (*Id*.)

In about the summer of 2011, White asked Marbury to obtain a permanent display board

for the continuing education office.  (White Dep. at 140-41; Marbury Dec. at ¶ 5).  Marbury and

the director of the continuing education program, Tiffany Carmichael, worked to find a board

that would serve their needs.  Marbury reported back to White regarding the proposal.  White

asked Marbury about the requisition form to pay for the item.  Marbury told White that she could

not requisition for payment because she could not use Title III funds for advertising or

continuing education.  (Marbury Dep. at 85-87).  Marbury told White that she would help fill out

a requisition for payment, but that she could not use her Faculty Development Title III codes for

---

[8]White testified that she talked to Lawler who informed her that this was a grey area.  Accordingly, they decided not to use Title III funds.  (White Dep. at 127-28).

the purchase.  (*Id*. at 86, 99).  White told her that she was to "get the board."  (*Id*. at 86).  White also stated, "you do what I tell you to do" and "that it was not too late for her to furlough [Marbury]."  (*Id*. at 97).  No Title III funds were used in the purchase of the board.  (Marbury Dep. at 100; White Dep. at 142-43).

According to White, she met with Marbury on July 6, 2011, about Marbury's progress on a continuing education catalog she had assigned Marbury and Carmichael to work on.  (White Dep. at 58).  White testified that after Marbury showed up for the meeting about one hour late, Marbury presented a one page listing of her work on the catalogue.  (*Id*. and Ex. 4).  When White asked her what she had been doing, Marbury did not provide a satisfactory explanation and stated that she was not going to do someone else's work.  (*Id*. at 59).  She then stated that she was not doing to do the catalogue.  (*Id*.)  White stated that Marbury was agitated and loud during the meeting, and, accordingly, she made the decision to terminate the meting.  (*Id*. at 62-63).

Marbury disputes the events of the July 6 meeting.  She states that the meeting was about the announcement board mentioned previously, "*not* the Continuing Education catalog." (Marbury Dec. at ¶ 5 (emphasis in original)).  Marbury states that she was only asked to help Carmichael with the catalog by providing some ideas, which she did.  (*Id*.)  Marbury denies that the catalog was mentioned in the meeting and asserts that the outline (exhibit 4) that White attributes to her was actually made by Carmichael and was not provided by Marbury during that meeting.  Finally, Marbury disputes that she was late for the meeting and that she raised her voice or was insubordinate.[9]  (*Id*. at ¶ 6).

---

[9]Marbury admits that she did make "some kind of remark about a 'bitchy attitude' but [she] was only joking" with White.  (Marbury Dec. at ¶ 7).

On July 7, 2011, there was another meeting.  This time White, Cassandra Blassingame, and Marbury were present.  White stated that the purpose of the meeting was to reiterate to Marbury her concerns regarding Marbury's failure to complete an assigned project and she thought that Marbury might apologize for her behavior on the previous day.  (White Dep. at 88-89, 91).  The meeting did not go well.  According to White, Marbury repeated her insubordinate statement and she was loud and aggressive.  Therefore, White ended the meeting.  (*Id*. at 100-01).  Marbury's view of the meeting is quite different.  She states that White once again told her to get the announcement board.  She responded by reminding White that she could not use Title III funds for the board.  (Marbury Dec. at ¶ 8).  During the meeting, Marbury states that White for the first time "pulled out the Continuing Education catalog."  (*Id*.)  Marbury responded by asking "her where she was going to get the instructors to teach all the classes or the physical space to put all the people, both of which were lacking."  (*Id*.)  White replied that "she did not pay [Marbury] to think and that [she] was only to do as [she] was told."  (*Id*.)

Because White told Marbury that she was going to be furloughed, she removed her personal belongings on the evening of July 7.  (Marbury Dec. at ¶ 10).  To the extent that White asserts that she (White) felt threatened and called security because she saw Marbury backed into a parking space and then enter the building with a box, Marbury denies that she reentered the building.

On July11, 2011, White prepared and submitted a letter to Dr. Hawkins recommending that he not renew Marbury's employment.  (White Dep. at Ex. 7).  White simply stated that Marbury's employment should not be renewed because she failed "to follow specific directives related to work assignments and insubordination."  (*Id*.)  Hawkins did not conduct any

independent investigation, but simply relied on White's recommendation.  (Hawkins Dec. at ¶ 7).[10]  On the same day, Hawkins issued a letter to Marbury stating that he was in agreement with the recommendation and that, effective July 11, 2011, Marbury would no longer be an employee of Talladega College.  (*Id*. at Ex. 8).  It is undisputed that at this juncture, Hawkins had no information that Marbury "had ever made any complaint or expressed any concerning regarding wrongdoing, illegality or fraud of any kind at the college."  (Hawkins Dec. at ¶ 7).

The Director of Human Resources, Brenda Rhoden, went to Marbury's office and informed her that she had been terminated.  (Marbury Dep. at 66-68).  Marbury was provided with a termination letter and Rhoden told her that she (Marbury) was being terminated immediately and that she was to collect her things, turn in her keys, and to leave.  (*Id*. at 68).[11]

## III.    DISCUSSION

"The FCA is the Government's 'primary litigation tool' for recovering losses resulting from fraud."[12]  *United States ex rel. Steury v. Cardinal Health, Inc*., 625 F.3d 262, 267 (5th Cir. 2010) (citing *United States ex rel. Marcy v. Rowan Cos.*, 520 F.3d 384, 388 (5th Cir. 2008)).  It imposes civil penalties on those who defraud the government by knowingly submitting or

---

[10]Hawkins' declaration is located at document 14-1 (Exhibit 1).

[11]In her "Additional Facts," Marbury also notes that in another undated instance White asked her to obtain funds for a meal following a faculty workshop.  (Marbury Dep. at 103-05).  White wanted to take the faculty to dinner, but wanted to be reimbursed.  (*Id*.)  Marbury asked Lawler about it and was informed that the funds could not be used because it was not deemed a faculty conference, which was a reimbursable expense.  (*Id*.)  When Marbury told White, she told Marbury to change the paperwork from workshop to conference.  (*Id*. at 106-07).  Marbury did make the change and Lawler ultimately approved the expense.  (*Id*. at 107).  Marbury did not report to anyone that she felt this was an inappropriate expenditure of Title III funds.  (*Id*. at 108).

[12]It dates back to the Civil War.  *See Young v. CHS Middle East, LLC*, 2013 WL 4498680, *4 (E.D. Va. August 20, 2013).

causing the submission of false claims for payment to the government.  31 U.S.C. § 3729(a)[13];
*Cardinal Health*, 625 F.3d at 267.  It also contains a whistleblower provision that aims to prevent
retaliation against employees who come forward with knowledge of their employer's FCA
violations.  31 U.S.C. § 3730(h).  Marbury alleges that Talladega College retaliated against her in
violation of the whistleblower provision.

Talladega College argues that it is entitled to summary judgment on Marbury's retaliatory
termination claim premised on the fact that she has not established a prima facie case and
because she has not sufficiently rebutted its articulated reasons for her termination.  (Doc. 13 at
16-26).[14]  The plaintiff disagrees.  (Doc. 15).

A.     **The Analytical Framework for Review**

The parties agree that the familiar *McDonnell Douglas* burden-shifting framework applies
to Marbury's retaliation claim under the FCA.  *See McDonnell Douglas Corp. v. Green*, 411 U.S.
792, 802-05, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  The undersigned also agrees.

The Eleventh Circuit Court of Appeals has not addressed this issue.  However, numerous
other courts have determined its applicability.  *See United States ex rel. Sxhweizer v. Oce* N.V.,
677 F.3d 1228, 1241 (D.C. Cir. 2012) (adopting approach but explaining that "[t]his burden
shifting framework is a useful screening device in the summary judgment milieu, but courts
typically put is aside once the third step is reached); *Harrington v. Aggregate Industries*

---

[13]A "claim" includes any request or demand for money made to a grantee "if the money or property is to be spent or
used on the Government's behalf or to advance a Government program or interest, and if the United States
Government provides or has provided any portion of the money or property requested or demanded...." 31 U.S.C. §
3729(b)(2)(A)(ii)(I).

[14]The page references for the briefs are to the electronic numbers assigned by the Clerk of the Court found at the top
of each page.

10

*Northeast Region, Inc.*, 668 F.3d 25, 30-31 (1st Cir. 2012) (stating that "[t]he *McDonnell Douglas* approach fits comfortably with the test that courts generally apply to retaliation claims under section 3730(h)(1)"); *see also United States ex rel. Erickson v. Uintah Sec. Servs. Dist.*, 268 F. App'x 714, 717 (10th Cir. 2008) (unpublished) (implicitly approving use of something akin to *McDonnell Douglas* burden shifting in FCA retaliation cases); *Scott v. Metro. Health Corp.*, 234 F. App'x 341, 346 (6th Cir. 2007) (unpublished) (stating that the familiar *McDonnell-Douglas* burden-shifting framework applies to retaliation claims); *United States ex rel. Parato v. Unadilla Health Care Ctr., Inc.*, 787 F. Supp. 2d 1329, 1341 (M.D. Ga. 2011); *United States ex rel. Scott v. Metro. Health Corp.*, 375 F. Supp. 2d 626, 643-44 (W.D. Mich. 2005); *Mann v. Olsten Certified Healthcare Corp.*, 49 F. Supp. 2d 1307, 1316-17 (M.D. Ala. 1999). Accordingly, to prove a prima facie case of retaliation, Marbury must show that (1) the employer is covered by the act at issue, (2) the employee engaged in protected activity, (3) the employee suffered adverse action, and (4) there is an inference of causation between the protected activity and the adverse action. *Mann*, 49 F. Supp. 2d at 1317.[15]

If Marbury demonstrates a prima facie case, the burden then shifts to Talladega College to articulate its legitimate, nonretaliatory reasons for the termination. *Id*. at 1317. As this burden "is one of production, not persuasion, it can involve no credibility assessment." *Reeves v.*

---

[15]Many courts require three elements: (1) the employee engaged in protected activity; (2) the employer had knowledge that the employee was engaged in protected activity; and (3) the employer retaliated against the employee because of this conduct. *See U.S. ex rel. Sharp v. Eastern Oklahoma Orthopedic Center*, 2013 WL 5816419, *11 (N.D. Okla. October 29, 2013); *Robinson v. Jewish Center Towers, Inc*., 993 F. Supp. 1475, 1477 (M.D. Fla. 1998) ("[T]he plaintiff must show that she engaged (1) in conduct protected under the False Claims Act; (2) defendant was aware of the plaintiff's actions; and (3) plaintiff was terminated in retaliation for her conduct."). However, other courts articulate a two part test. *See Mack v. Augusta–Richmond County, Georgia*, 365 F. Supp. 2d 1362, 1378 (S.D. Ga. 2005) ("[A] plaintiff must show that (1) he engaged in protected conduct and (2) that the defendant retaliated against him because of that conduct.").

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

Then, it is up to Marbury to demonstrate that the reasons for the termination are not the true

reason, but constitute pretext for retaliation.  *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S.

248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).  "The employee may meet this burden by

persuading the factfinder either directly that a retaliatory reason more than likely motivated the

employer or indirectly that the proffered reason for the employment decision is not worthy of

belief."  *Mann*, 49 F. Supp. 2d at 1317 (citing *Burdine*, 450 U.S. at 256, 101 S. Ct. at 1095.

    **B.**    **Analysis**

        **1.**    **Absence of a prima facie case**

Talladega College challenges Marbury's prima facie case on two distinct grounds.  First,

it argues Marbury has not, and cannot, demonstrate that she engaged in any protected activity.

(Doc. 13 at 16).  Second, it argues that she has not demonstrated a causal connection between her

activities and her termination.  (*Id*. at 22).

        **a.**    **There is no protected activity**

Talladega College initially argues that Marbury did not engage in protected activity

because she "took no action in furtherance of an action under the False Claims Act."  (Doc. 13 at

16).  In support of this argument, Talladega College notes that "Marbury confirmed in her

deposition that she never took any steps toward making a claim ... and never told anyone at the

[C]ollege that she was contemplating a claim under the ... Act."  (*Id*. at 16-17).  Next, it states

that Marbury did not file a grievance or advance a fraud complaint under the College's grievance

policy.  (*Id*. at 17).  Still further, the College argues that "there is no evidence that Marbury took

any action in furtherance of a claim under the FCA."  (*Id*.)  Finally, it asserts that Marbury cannot

overcome summary judgment because there is no evidence a false claim was ever submitted, her actions were not an effort to stop an FCA violation, and even if Marbury had made the purportedly improper request, Lawler would not have approved it.  (*Id*. at 18-21).

Marbury retorts "that 'an employee is entitled  to relief if [s]he has been discharged for acting in furtherance of other efforts to stop [one] or more violations of the [FCA], regardless of whether the employee was acting in furtherance of a civil action under the [FCA]."  (Doc. 15 at 16 (citing *Thomas v. ITT Educ. Services, Inc.*, 2012 WL 1964501 (E.D. La. May 31, 2012) (citing *United States ex rel. Patton v. Shaw Servs., LLC.*, 418 F. App'x 366, 372 n.5 (5th Cir. 2011))).  She goes on to state that "[w]hat might have happened after her [conduct] is irrelevant both to her motive and the motive of White in firing her.  In sum, she engaged in protected conduct."  (Doc. 15 at 16).

### i.      The law

As noted above, the FCA "whistleblower" provision is intended to protect employees who take steps to uncover and report fraudulent submissions to the government.  Effective May 20, 2009, Congress amended the Act to provide relief to any employee discharged for acting "in furtherance of other efforts to stop [one] or more violations of this subchapter."  31 U.S.C. § 3730(h)(1); Pub. L. No. 111–21, § 4(d), 123 Stat. 1617, 1624–25 (2009).  The amendment broadened the protections afforded whistleblowers under the FCA.  *Guerrero v. Total Renal Care, Inc.*, 2012 WL 899228, *4, n.4 (W.D. Tex. 2012) (unpublished).  "Congress enacted the [FCA] in order to discourage fraud against the government and to encourage persons with knowledge of fraud to come forward.  *See* S. Rep. No. 345, at 4-6 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5269–71.  Thus, '[p]rotected activity should ... be interpreted broadly.'"

*Guerrero*, 2012 WL 899228, at *6 (citing *McKenzie v. BellSouth*, 219 F.3d 508, 514-15 (6th Cir.

2000) (quoting S.Rep. No. 99–345, at 35).  *See also Layman v. MET Laboratories, Inc.* 2013 WL

2237689, *7 (D. Md. May 20, 2013) (unpublished) ("Congress stated that the 'language is

intended to make clear that [§ 3730(h)] protects not only steps taken in furtherance of a potential

or actual qui tam action, but also ... taken to remedy ... misconduct through methods such as

internal reporting to a supervisor or company compliance department.'  ....  This is in contrast

with pre-FERA standards pursuant to which protected activity did not include reporting to one's

supervisor.").  As noted in *Guerrero*:

> The "in furtherance" language in the statute indicates there must be a
> "nexus" between the protected activity and the filing or potential filing of a qui
> tam suit.  *See Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 187 (3d Cir.
> 2001) (quoting *McKenzie v. BellSouth Telecomm., Inc.*, 219 F.3d 508, 515 (6th
> Cir. 2000)).  However, as Congress recently made clear in its 2009 amendment of
> the statute, conduct may be protected "whether or not such steps are clearly in
> furtherance of a potential or actual qui tam action." 155 Cong. Rec. E1295–03,
> E1300, 2009 WL 1544226 (daily ed. June 3, 2009) (statement of Rep. Howard L.
> Berman) (emphasis added).  Thus, an employee must have "taken steps" towards
> the exposure of the false claims, such as investigating or complaining about fraud.
> *United States ex rel Gray v. Lockheed Martin Corp.*, No. 05–4201, 2010 WL
> 672017, at *3 (E.D. La. Feb. 19, 2010).
>
> Courts consider the internal reporting of fraudulent activity to a supervisor
> to be a step in furtherance of uncovering fraud, and thus protected under the FCA.
> *See Robertson*, 32 F.3d at 951; *United States ex rel. Yesudian v. Howard Univ.*,
> 153 F.3d 731, 741 n. 9 (D.C. Cir. 1998) ("[I]nternal reporting of false claims is
> itself an example of a protected activity.").  Indeed, Congress specifically
> amended the language of § 3730(h) in order to ensure that § 3730(h) protects
> internal reporting:
>
> > This language is intended to make clear that [§ 3730(h)] protects
> > not only steps taken in furtherance of a potential or actual qui tam
> > action, but also steps taken to remedy the misconduct through
> > methods such as internal reporting to a supervisor or company
> > compliance department ....

155 Cong. Rec. E1295–03, at E1300.

> However, in order to constitute protected conduct, an employee's internal report must specifically allege fraudulent claims for federal funds and not merely address concerns about general misconduct. *Patton*, 418 F. App'x at 372 ("For internal complaints to constitute protected activity 'in furtherance of' a qui tam action, the complaints must concern false or fraudulent claims for payment submitted to the government."); *Bouknight v. Hous. Indep. Sch. Dist., No. H–06–1057*, 2008 WL 110427, at *4 (S.D. Tex. Jan. 8, 2008) ("A plaintiff must do more than investigate or complain about an employer's improper conduct; a plaintiff must have specifically investigated or complained about the employer making false claims for federal funds.").

*Guerrero*, 2012 WL 899228 at *4-5. Additionally, the employee's actions must be "sufficient to support a reasonable conclusion that the employer could have feared being reported to the government for fraud or sued in a qui tam action by the employee." *United States ex rel. Sanchez v. Lymphatx*, 596 F.3d 1300, 1304 (11th Cir. 2010).[16]

### ii.    Defendant's challenges

Marbury asserts that she engaged in protected activity because she "objected to going

---

[16]In discussing the "distinct possibility" of litigation under the FCA for purposes of a retaliation claim, the Eleventh Circuit also noted that in *Mann* the court used a similar standard in considering a summary judgment motion. In *Mann*, the court stated:

> Whether the employee engaged in conduct from which a factfinder could reasonably conclude that the employer could have feared that the employee was contemplating filing a qui-tam action against it or reporting the employer to the government for fraud.... Under this approach, the court will look for evidence that the plaintiff, either by words or actions, communicated to the employer that she believed that the employer had engaged in illegal or fraudulent conduct involving submission of claims for payment to the government. Such a showing could be made, for example, by evidence that the plaintiff characterized the employer's conduct as illegal or fraudulent or recommended that legal counsel become involved.

*Mann*, 49 F. Supp. 2d at 1314.

> While *Sanchez* was decided before the 2009 amendment, the cited language squares with the amendment's provision that provides relief to persons who act "in furtherance of other efforts to stop [one] or more violations of [the FCA]." *Id.* at 1303-04 (citing 31 U.S.C. ¶ 3730(h)(1)).

along with submitting false claims for payment of federal funds." (Doc. 15 at 16). Talladega College counters that this is insufficient because there was no "distinct possibility" that an FCA claim would be filed. (Doc. 13 at 18). It is undisputed that Marbury never took any steps toward making an FCA claim and never filed a grievance with the College concerning any such violations. However, such formal actions are not necessarily required. As noted above, the FCA whistleblower provision protects the making of internal complaint. The question before the court is whether the plaintiff's actions in refusing to complete requisition forms accompanied by protestations about the use of Title III funds can amount to protected activity under the 2009 amendment to the FCA. The court finds that they do under the present circumstances.

During Marbury's less than one year term with Talladega College, there were four incidents involving questionable appropriation requests by White: (1) funding for a $90.00 poster for the opening of the downtown continuing education site, (2) a request for funds for White's travel to New York, (3) a request for a permanent display board for the continuing education office, and (4) funds for a dinner following a faculty workshop. In each instance, White insisted that Marbury requisition funds for the payment of the item or event. Marbury challenged White concerning each expenditure, insisting that Title III funds could not be used for the same. White never specifically told Marbury to use Title III funds improperly. No Title III funds were expended for any item or event other that the last item involving the dinner. The dinner was approved for payment after the underlying event was re-characterized as faculty conference instead of a faculty workshop.[17]

The court finds that the evidence is "sufficient to support a reasonable conclusion that

---

[17]Because there is no evidence that the expenditure for the dinner was improper, the court cannot infer such.

[White, and thereby Talladega College,] could have feared being reported to the government for fraud" under the circumstances. *Sanchez*, 596 F.3d at 1304. Marbury clearly challenged White's directive to requisition funding for each item. White even directed Marbury to change the requisition form concerning the bulletin board to "supplies or something else" and the dinner reimbursement from a "faculty workshop" to a "faculty conference."

As noted above, the 2009 amendment to the Act is intended to encourage private prevention of the making of false claims against the United States. However, there must still be some affirmative step towards stopping a violation of the FCA, such as investigating or complaining about fraud. *See Guerrero*, 2012 WL 899228 at *4-5 (citing *Lockheed Martin*, 2010 WL 672017, at *3). *See also Halasa v. ITT Educational Services, Inc.*, 690 F.3d 844, 847-48 (7th Cir. 2012) (noting on summary judgment review that plaintiff's investigation of claims of students receiving inappropriate assistance and altering of test scores and then reporting the findings to supervisors "presumably to ensure that ITT ended these practices and to prevent ITT from making any false certifications to the U.S. Department of Education in connection with its [student aid]" would be sufficient to permit a trier of fact to find that the plaintiff engaged in "efforts to stop" potential FCA violations)*; Layman*, 2013 WL 2237 689 at *8 (holding that an employee sufficiently alleged protected activity when he informed his supervisors that fraudulent calculations used to certify contract compliance amount to fraud on the government); *Brazil v. Cal. Northstate Coll. of Pharmacy, LLC*, 904 F. Supp. 2d 1047, 1055 (E.D. Cal. 2012) (finding on a motion to dismiss that allegations that an employee reported to his employer that it was committing fraud with regard to its tuition practices that could result in civil and criminal sanctions constituted protected activity); *Manfield v. Alutiiq Intern. Solutions, Inc.*, 851 F. Supp.

17

2d 196, 204 (D. Me. 2012) (stating that "the act of internal reporting itself suffices as both the effort to stop the FCA violation and the notice to the employer that the employee is engaging in protected activity"); *United States ex rel. Moore v. Cmty. Health Servs*., No. 3:09cv1127, 2012 WL 1069474, at *9 (D. Conn. Mar. 29, 2012) (holding on a motion to dismiss that an employee's complaint regarding fraudulent billing practices was sufficient to state a retaliation claim under the FCA); *United States ex rel. George v. Boston Scientific Corp*., 864 F. Supp. 2d 597, 606-7 (S.D. Tex. 2012) (finding complaint sufficient concerning protected activity where an employee questioned on two separate occasions whether her employer's off-label uses were legal or amounted to fraud on the government); *But see*, *Young v. CHS Middle East, LLC*, 2013 WL 4498680, *7 (E.D. Va. August 20, 2013) ("Merely raising concerns regarding possible non-compliance with a contract, as Plaintiffs do, without more, cannot form the basis of protected activity cognizable under the FCA's anti-retaliation provision.")

In this instance, the court finds that the requisite step has been taken – particularly with regard to the bulletin board matter.  While there was no independent investigation, no use of the College's grievance process, and no report to any compliance office or officer, Marbury did discuss and complain about White's requests with Lawler, the Title III Coordinator at Talladega College.  They did talk about the fact that Title III funds could not be used except in very limited circumstances and not as proposed by White.  Although no further investigation or report was made, the court finds that this evidence along with Marbury's affirmative opposition to White's request sufficient to overcome the motion for summary judgment.  This is particularly true where there is a fact dispute concerning whether White was intentionally attempting to disregard the rules concerning the use of Title III funds or whether she was simply asking Marbury to finds an

18

appropriate means to satisfy a need of the College.  This is significant because Marbury must be

acting "in furtherance of other efforts to stop [one] or more violations of the [Act]."  31 U.S.C. §

3730(h).

The defendant also argues that there is no evidence that Title III funds ultimately were

misapplied.  As best the court can discern, Title III funds were only used to reimburse White for

the faculty dinner and Marbury did not complain to anyone about this expenditure after White

asked her to re-characterize the item as a conference instead of a workshop.  (Marbury Dep. at

108).  While this weighs on the issue of whether White or Talladega College could have feared

being reported to the government for fraud or sued in a qui tam action, it is not dispositive of the

summary judgment motion for a number of reasons.  First, there is no requirement that a false

claim actually be filed or that funds actually be expended.  Second, the statute, particularly the

2009 amendments, are intended to prevent the filing of false claims and to discourage fraud.

To the extent the defendant argues that there is no violation because any decision to

expend Title III funds in this situation would have to be made by Lawler (doc. 13 at 21), the court

is not impressed.  While it is undisputed that Lawler had the authority to approve or disapprove a

request for Title III funds, it does not alter the fact that the evidence at this juncture supports the

conclusion that Marbury actively opposed White's purported attempt to improperly use such funds

and was terminated at about that same time.  Whether Lawler ultimately would have approved the

expenditure is not the *sine qua non* in this instance.

In sum, White's requests that Marbury complete requisition forms coupled with Marbury's

protestations about using Title III funds are sufficient to constitute "protected activity" in this case

as to the events surrounding the permanent display board for the continuing education office.

Accordingly, the defendant's motion for summary judgment is due to be denied as to this challenge.

### b.       No causal connection

The defendant next argues that Marbury has not demonstrated a causal connection between any protected activity and her termination.  (Doc. 13 at 21).  Specifically, it argues that "because the decision-makers were not on notice of any protected conduct ... their decisions could not have been motivated by retaliation."  (*Id*.)[18]  In support of this conclusion, the defendant states that "[t]here is no dispute in this case that Dr. Hawkins had no knowledge of Marbury making any complaint or raising any issue related to fraud, illegality or wrongdoing.  Therefore, his termination decision could not have been motivated by retaliatory intent...."  (*Id*. at 22).  The defendant also states that there is no evidence of unlawful motive on the part of Dr. White.  (*Id*.)  Talladega College premises this argument on two items: (1) White never told Marbury to use Title III funds for the announcement board and (2) Marbury's claim rests on the illogical premise that White pressured her to use the funds when it was Lawler, as the Title III coordinator who actually approved such expenditures.  (*Id*. at 22-23).

Marbury counters that she can demonstrate retaliatory animus under the "cat's paw" theory.  (Doc. 15 at 17 (citing *Staub v. Proctor Hosp.*, --- U.S. ---, 131 S. Ct. 1186, 1194 (2011))).  *See also Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999) (causation may be established under the "cat's paw" theory in a Title VII case).  In order to use this theory, however, a plaintiff must show "that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee."  *Id.*

---

[18]The defendant again also argues that there was no protected activity.  (*Id*.)  This matter will not be addressed again.

In *Staub*, the Supreme Court held that an employer could be liable under the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA") only if the subordinate supervisor (1) performs an act motivated by antimilitary animus that is intended to cause an adverse employment action, and (2) that act is a proximate cause of the ultimate employment action. *Staub*, 131 S. Ct. at 1194. Accordingly, an employer will be liable only if the actions of an unlawfully motivated supervisor are a proximate cause of the termination. *Id*.

In this instance, White was aware of the plaintiff's protected activity and she was also the initiator of the recommendation to terminate her. Dr. Hawkins simply accepted her recommendation. There is no evidence he conducted any independent investigation or decision-making. To the contrary, the record reveals that he simply followed White's recommendation.

To the extent that the defendant repeatedly argues that White never asked Marbury to expend Title III funds, the court notes that the evidence must be viewed in the light most favorable to the plaintiff, including reasonable inferences, at this juncture. In view of the funding generally available to Marbury, her admonitions to White about using Title III funds, and White's directives to Marbury to make the purchases or expenditures, the motion for summary judgment must be denied at this juncture.

## 2. Absence of pretext

Lastly, the defendant argues that the plaintiff has presented no evidence challenging the reason for her termination. The defendant argues she was terminated because of her failure to complete an assigned task and her insubordination. (Doc. 13 at 24-25). It further states that her unsupported protestations concerning the purported conduct, are not sufficient to overcome the motion for summary judgment. (*Id*. at 25). The plaintiff retorts that she has objective evidence to

refute the defendant's business reason.  (Doc. 15 at 20).

There is no question that the plaintiff disputes the facts that purportedly led to her termination.  She denies that she refused to work on the Continuing Education catalogue and she denies being insubordinate.  Additionally, the record shows that the events – Marbury's protestations regarding the announcement board and her firing – were very close in time during June and early July 2011.  This is in line with Marbury's testimony that White told her she would be furloughed if she refused to purchase the announcement board.  Still further, White gave Marbury an "outstanding" evaluation less than two months before her firing.  (White Dep. at 72-73 & Ex. 6).  The only negative references on the performance appraisal were "occasional tardiness" and that she needed some improvement on "judgement issues."[19]  (*Id*. at Ex. 6).  This is an instance where the whole is greater than the sum of the pats.  When all the facts are viewed in a light most favorable to the plaintiff, she has sufficiently challenged the defendant's proffered reasons for her termination.  Accordingly, the court finds that the motion for summary judgment is due to be denied on this basis.  The court believes the plaintiff has demonstrated a genuine issue of fact regarding the defendant's proffered reasons.

## IV.   CONCLUSION

While this is a close case, premised on the reasoning above, the court finds that the defendant's motion for summary judgment (doc. 12) is due to be denied.  An appropriate order will be entered.

---

[19]The performance appraisal did not provide any specifics.

22

**DONE**, this the 22nd day of January, 2014.

**JOHN E. OTT**
Chief United States Magistrate Judge